IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **TOWN NORTH BANK, N.A.**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:11-CV-3125-L** |
| | § | |
| **SHAY FINANCIAL SERVICES, INC.;** | § | |
| **UBS FINANCIAL SERVICES INC.;** | § | |
| **MORGAN STANLEY& CO. LLC;** | § | |
| **MERRILL LYNCH & CO., INC.;** | § | |
| **MERRILL LYNCH, PIERCE, FENNER &** | § | |
| **SMITH INCORPORATED; AND** | § | |
| **J.P. MORGAN SECURITIES LLC,** | § | |
| **as successor in interest to** | § | |
| **BEAR STEARNS & CO., INC.,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Bank Defendants' Motion for Interlocutory Appeal Pursuant to 28 U.S.C.

1292(b) and Stay of Discovery (Doc. 87) ("Motion for Interlocutory Appeal"), filed April 29, 2013.

In reviewing Defendants' Motion for Interlocutory Appeal, the court revisited the briefs filed by the

parties in conjunction with Defendants' motions to dismiss Plaintiff's Amended Complaint.  After

carefully reviewing the briefs filed by the parties in conjunction with the motions to dismiss the

Amended Complaint and the allegations in the Amended Complaint, the court, for the reasons herein

explained, determines that the Amended Complaint, while almost twice as long as the Original

Complaint, does not cure the deficiencies noted in Defendants' original motions to dismiss and fails

to state claims against Defendants upon which relief can be granted.

**Memorandum Opinion and Order - Page 1**

The court therefore *sua sponte* **vacates** its March 30, 2013 opinion and **issues** this Amended Memorandum Opinion and Order in its place, which discusses in more detail and expounds on the grounds for dismissal set forth in Defendants' motions to dismiss.  The court therefore **grants** the Motion to Dismiss Plaintiff's Amended Complaint Against Defendants UBS Financial Services, Inc., Morgan Stanley & Co. LLC, Merrill Lynch & Co., Inc. Merrill Lynch, Pierce, Fenner & Smith Inc., and J.P. Morgan Securities LLC (Doc. 62); **grants** Shay Financial Services, Inc.'s Motion to Dismiss (Doc. 60); and **denies as moot** the Bank Defendants' Motion for Interlocutory Appeal Pursuant to 28 U.S.C. 1292(b) and Stay of Discovery (Doc. 87).

## I.      Factual and Procedural Background

Plaintiff Town North Bank, N.A. ("Town North" or "Plaintiff") brought this action on November 11, 2011, seeking more than $100 million in damages against Defendants Shay Financial Services, Inc. ("Shay"); UBS Financial Services, Inc.; Morgan Stanley & Co. LLC; Merrill Lynch & Co., Inc.; Merrill Lynch, Pierce, Fenner & Smith Inc.; and J.P. Morgan Securities LLC (Doc. 62) (collectively, "Bank Defendants")[1] for alleged misrepresentations and omissions pertaining to thirty-seven securities purchased by Plaintiff from Defendants.  The securities declined significantly in value after the stock market collapse in 2008.[2]  Town North has alleged claims against Defendants

---

[1]   The court refers to Shay and the Bank Defendants collectively as "Defendants." The court refers to the individual Bank Defendants in accordance with the way in which they are referenced in the Amended Complaint. Accordingly, the court refers to UBS Financial Services, Inc. as "UBS"; Morgan Stanley & Co. LLC as "Morgan Stanley"; and the two Merrill Lynch Defendants collectively as "Merrill Lynch."  The court refers to J.P. Morgan Securities LLC as "Bear Stearns" because, according to the Amended Complaint, the transactions at issue involved Bear Stearns, which was later succeeded by J.P. Morgan Securities LLC.

[2]   Information regarding the thirty-seven securities that form the basis of Plaintiff's federal and state claims in this case is included in a chart attached to this opinion.  The chart and information in the chart were compiled by the court using information in Plaintiff's Amended Complaint and the offering documents attached to Defendants' motions to dismiss, which are referred to in the Amended Complaint and central to Plaintiff's claims. **The chart is attached hereto as Attachment A and is made a part of this opinion and order as if repeated herein verbatim.**

**Memorandum Opinion and Order - Page 2**

based on violations of federal and state securities laws and common law fraud.  Town North also asserts a breach of fiduciary duty claim under Texas law against Shay. Town North is a national banking association that was formed in 1972 and is located in Dallas, Texas.  Town North has approximately $707 million in assets and 60 employees.  On December 31, 2007, before the nationwide housing market collapse, Town North had assets in excess of $1.3 billion and approximately 250 employees.  Defendants are securities brokers.  Town North's claims stem from asset-backed securities ("ABS"), which include residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"), that it purchased from Defendants between 2005 and 2007.

With respect to the alleged securities violations, Town North contends that Defendants violated: (1) section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b),[3] and Securities and Exchange Commission ("SEC") Rule 10b-5, which implements section 10(b); and (2) Texas Revised Civil Statute Article 581-33(A)(2) and (F)(2).  According to Town North, Defendants violated the aforementioned state and federal securities statutes by making misrepresentations or omissions regarding the value and riskiness of the securities purchased by Town North.  Town North contends that the misrepresentations or omissions by Defendants before and after it purchased the securities caused it to sustain approximately $113 million in damages.

Town North's federal and state claims are based in large part on its contention that the offering documents prepared by Defendants' affiliates contained false information or information that was no longer accurate by the time it purchased the securities at issue, and that Defendants

---

[3] With respect to its federal securities claim under section 10(b) of the Exchange Act, Plaintiff refers in its Amended Complaint to 15 U.S.C. § 78(b).  *See* Pl.'s Am. Compl. ¶ 202.  The reference to section 78(b) rather than 78j(b) appears to be a typographical error.

**Memorandum Opinion and Order - Page 3**

misled it by failing to disclose that the securities were subject to greater risk at the time of the sale than indicated in the stock offering documents prepared by Defendants' affiliates at some earlier date.  In this regard, Town North alleges that by late 2006 and 2007, Defendants' affiliates and others who structured the RMBS and CDOs understood that the RMBS asset credit ratings and correlation assumptions previously used to structure and rate the securities, before the housing and market collapse, "were no longer accurate or reliable."  Pl.'s Am. Compl. ¶ 32.  Town North alleges that after the record level of subprime mortgage defaults and the nationwide decline in housing prices, Defendants' affiliates knew or should have understood that the use of "boom-time assumptions concerning housing price appreciation, rates of mortgage default, and mortgage loss upon default" to rate the securities inaccurately represented the securities' risk. *Id.* ¶ 33.  Town North contends that Defendants had a duty to speak because they knew that the offering documents, which were prepared by Defendants' affiliates, contained inaccurate or outdated information regarding the riskiness of the securities, and that Defendants breached this duty by failing to disclose material nonpublic information in their possession that was necessary to make the statements in the offering documents, at the time of sale, not misleading.  Town North contends that by 2007, Defendants "had enough information to know and foresee that the information not disclosed caused the securities Defendants sold to Plaintiff in 2007 to have substantial embedded losses." *Id.* ¶ 75.

On February 10, 2012, Defendants moved to dismiss Plaintiff's federal and state claims pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA").  On April 9, 2012, Town North filed its Amended Complaint and responses to Defendants' motions to dismiss, contending that its amended pleadings satisfied the alleged deficiencies noted in the motions to dismiss.  In response

to a request by the parties, the court denied as moot Defendants' motions to dismiss in light of Plaintiff's Amended Complaint.

On May 18, 2012, Shay moved to dismiss Plaintiff's federal and state claims in the Amended Complaint. On the same day, the Bank Defendants also moved to dismiss Plaintiff's claims against them under Rules 12(b)(6) and 9(b) and the PSLRA. Shay then joined in the arguments made in the Bank Defendants' motion to dismiss. On March 30, 2013, the court denied two motions to dismiss Plaintiff's Amended Complaint filed by Shay and the Bank Defendants. Subsequently, on April 29, 2013, the Bank Defendants filed their Motion for Interlocutory Appeal, requesting leave to file an interlocutory appeal regarding their alleged affirmative disclosure obligation or "duty to speak." The Bank Defendants also request a stay of discovery until the threshold "duty to speak" issue has been resolved by the Fifth Circuit because, according to the Bank Defendants, Town North's claims encompass numerous securities and will require the parties to engage in extensive discovery. Mot. for Interlocutory Appeal 12. Shay moved and was permitted to join in the Bank Defendants' Motion for Interlocutory Appeal. As previously noted, the court determines that the Amended Complaint fails to state claims against Defendants upon which relief can be granted, and Defendants are entitled to dismissal of all of Plaintiff's claims. The court's determination in this regard moots Defendants' Motion for Interlocutory Appeal.

## II.      Standard for Rule 12(b)(6)—Failure to State a Claim

To defeat a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008); *Guidry v. American Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir.

2007).  A claim meets the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly,* 550 U.S. at 555 (citation omitted).  The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.*  (quotation marks, citations, and footnote omitted).  When the allegations of the pleading do not allow the court to infer more than the mere possibility of wrongdoing, they fall short of showing that the pleader is entitled to relief.  *Iqbal*, 556 U.S. at 679.

    In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff.  *Sonnier v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  In ruling on such a motion, the court cannot look beyond the pleadings.  *Id.*; *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).  The pleadings include the complaint and any documents attached to it.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).  Likewise, "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'"  *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).  In

this regard, a document that is part of the record but not referred to in a plaintiff's complaint *and* not attached to a motion to dismiss may not be considered by the court in ruling on a 12(b)(6) motion. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 & n.9 (5th Cir. 2012) (citation omitted).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). While well-pleaded facts of a complaint are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (citation omitted). Further, a court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Stated another way, when a court deals with a Rule 12(b)(6) motion, its task is to test the sufficiency of the allegations contained in the pleadings to determine whether they are adequate enough to state a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *rev'd on other grounds*, 113 F.3d 1412 (5th Cir. 1997) (en banc). Accordingly, denial of a 12(b)(6) motion has no bearing on whether a plaintiff ultimately establishes the necessary proof to prevail on a claim that withstands a 12(b)(6) challenge. *Adams*, 556 F.2d at 293.

A statute of limitations may support dismissal pursuant to Rule 12(b)(6) when it is evident from a plaintiff's pleadings that the action is time-barred and the pleadings fail to set forth or raise

some basis for tolling the statute. *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) (citations omitted).

As fraud is alleged, Federal Rule of Civil Procedure 9 comes into play. Since the PSLRA incorporates the fraud requirements into the pleading standard, the court discusses the fraud component in section III of this opinion.

## III.    Federal Securities Claim (All Defendants)

Town North's federal securities claim is based on three categories of misrepresentations and omissions: (1) Defendants' alleged omissions or failure to disclose information regarding the riskiness of the securities necessary to make information in the securities' offering documents not misleading when Town North purchased the securities from Defendants; (2) an alleged pre-sale misrepresentation by Shay regarding Class B-2 units of Residential Asset Securitization Trust 2006-A16 ("RAST 2006-A16"); and (3) alleged post-sale misrepresentations and omissions by Shay regarding RAST 2006-A16 and other securities previously purchased by Town North.

Town North's federal securities claim is based in large part on the first category of alleged omissions. As previously noted, Town North alleges with respect to this category that, when it purchased the securities at issue, Defendants provided it with offering documents that were prepared by Defendants' affiliates. Town North alleges that the offering documents contained false, misleading, outdated, or insufficient information regarding the riskiness of the securities, and Defendants failed to disclose (at the time of sale) that the securities were subject to far greater risk of loss than that disclosed in the offering documents.

The second and third categories are based on alleged misrepresentations and omissions by Shay. Regarding the second category of alleged misrepresentations, Town North contends that, when Shay "pitched" RAST 2006-A16 to it, "Shay's representative told Town North Bank the issue would receive a ratings upgrade. The opposite was true." Pl.'s Am. Compl. ¶ 81. Regarding the third category, Town North alleges that in October 2007, after it purchased RAST 2006-A16, Shay prepared an analysis of the security as of September 30, 2007, in which it reported that "this security is rated 'A' by S&P and Fitch as of December 28, 2006[,] and is not subject to a rating downgrade at this time." *Id.* ¶ 82. Town North contends that Shay's October 2007 analysis was misleading because it was based on inaccurate or unreliable default assumptions, and that Shay should have known that the declining value of RMBS securities was due to excessive credit risk in the assets underlying the securities because it was the distributor of RMBS for an affiliate's managed asset fund. Town North further alleges that Shay subsequently represented, during presentations in March and August 2008 to Town North's board of directors, that the decline in the value of the securities previously purchased by Town North before 2007 was only an aberration due to timing and market unrest. *Id.* ¶ 104. Town North contends that, because Shay failed to disclose all it knew about the growing and substantial risk of total loss associated with these securities and RAST 2006-A16, Town North continued to hold the securities rather than sell them and suffered substantial losses as a result.

Defendants contend that Town North's Amended Complaint fails to adequately allege: (1) a duty to disclose; (2) an actionable misrepresentation or omission; (3) scienter; (4) reliance; or (5) loss causation. Defendants further assert that Plaintiff's amended pleadings do not meet the

plausibility and specificity requirements under Rule 9(b) and the PSLRA, and that Town North's federal securities claim is barred by the applicable statute of limitation and statute of repose.

Section 10(b) of the Exchange Act prohibits "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Rule 10b-5, which implements section 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege:[4] "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

Federal securities claims based on allegations of fraud must be pleaded with particularity as required by Federal Rule of Civil Procedure 9(b) and the PSLRA.  *Tellabs, Inc. v. Makor Issues &*

---

[4] Although the Court used the word "prove" in stating the elements of a claim, *Stoneridge* was a Rule 12(b)(6) case.  Accordingly, allegations must be sufficient for the court to reasonably infer that a violation has occurred that encompasses all of these elements.

*Rights, Ltd.*, 551 U.S. 308, 319-21 (2007); *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008). Dismissal for failure to plead fraud with particularity pursuant to Rule 9(b) is treated as a dismissal under Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996)). Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," but circumstances constituting fraud must be alleged with particularity. Fed. R. Civ. P. 9(b); *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010). "[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out" with respect to a fraud claim. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003).

As earlier stated, the PSLRA incorporates Rule 9(b)'s requirements into the pleading standard for federal securities fraud claims. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). In addition to Rule 9(b)'s requirements, the PSLRA requires a plaintiff, who alleges in a private securities action that the defendant made misleading statements or omissions, to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u4(b)(1)(B). For "each act or omission alleged" to be false or misleading, a plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A plaintiff asserting a federal securities fraud claim must therefore "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*

**Memorandum Opinion and Order - Page 11**

(quoting 15 U.S.C. § 78u-4(b)(2)); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 412 (5th Cir. 2001) ("[A] plaintiff alleging a section 10(b)/Rule 10b-5 claim must now plead specific facts giving rise to a strong inference of scienter.") (citations omitted). "[S]imple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b)." *Dorsey*, 540 F.3d at 339 (quoting *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)).

Allegations of motive and opportunity may enhance the strength of the inference of scienter. *Flaherty*, 565 F.3d at 208. Without more, however, motive and opportunity allegations are insufficient to satisfy the scienter requirement. *Id.* In addition, "[o]missions and ambiguities count against inferring scienter, for plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc.*, 551 U.S. at 326 (citation and internal quotation marks omitted). An allegation regarding a statement or omission may be made on information and belief, but "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u4(b)(1)(B). "[T]his luxury must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (internal quotations and citation omitted). While every single fact upon which a plaintiff's beliefs concerning false or misleading statements are based need not be pleaded with particularity, the plaintiff must nevertheless "plead with particularity *sufficient* facts" to support its beliefs. *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 352 (5th Cir. 2002) (emphasis in original and citation omitted).

For purposes of a securities fraud claim, scienter means to "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs.*

**Memorandum Opinion and Order - Page 12**

*LDC v. Phillips*, 401 F.3d at 643 (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)).   "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *R2 Invs. LDC*, 401 F.3d at 643 (internal quotations marks and citations omitted).   Pursuant to the PSLRA, the court considers "plausible inferences opposing as well as supporting a strong inference of scienter." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).   The inference of scienter, however, must ultimately be "'cogent and compelling,' not merely 'reasonable' or 'permissible.'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 324).

### A.    Statute of Repose

Until 2002, claims brought under section 10(b) of the 1934 Act and Rule 10b-5 were governed by a one-year statute of limitation and a three-year statute of repose. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991) ("Litigation instituted pursuant to § 10(b) and Rule 10b-5 . . . must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation.").   In 2002, Congress enacted the Sarbanes-Oxley Act, which extended the statute of limitation to two years and the statute of repose to five years. *See* 28 U.S.C. § 1658(b) (2002).   As a result, section 10(b) and Rule 10b-5 claims must be filed within two years after the discovery of the violation. *See id.*   In any case, a securities claim under federal law must be filed no later than five years after the date of the alleged violation. *Id.*   Unlike the limitations periods, which do not run until after the discovery of the facts constituting a violation, the repose period begins to run the moment the alleged violation occurs,

regardless of the plaintiff's discovery.  28 U.S.C. § 1658; *see Lampf, Pleva, Lipkind, Prupis &*

*Petigrow*, 501 U.S. at 363; *Topalian v. Ehrman*, 954 F.2d 1125, 1135 (5th Cir. 1992).

Defendants contend that Town North's federal security claims based on securities with

offering documents dated before November 11, 2006, are barred by the five-year statute of repose

applicable to such claims.  Town North responds that, because its claims are based on omissions by

Defendants of material nonpublic information, rather than the offering documents themselves, the

only relevant dates are the dates it purchased the securities, not the dates that the offering documents

were issued.  The court disagrees.

While Town North contends that its Rule 10b-5 claim is based on Defendants' omissions

rather than the offering documents, the only affirmative statements alleged to be false or misleading,

other than those allegedly made by Shay in March 2007 regarding RAST 2006-A16 and Shay's post-

sale analyses or presentations, are those in the offering documents.  Specifically, Town North

repeatedly alleges that Defendants were aware of, but failed to disclose, information regarding the

riskiness of the securities that was necessary to make the statements in the offering documents not

misleading at the time of sale.  In response to the motions to dismiss, Town North similarly attributes

the misleading statements in the offering documents to Defendants and contends that they should

be liable for failing to disclose information that would have made the offering documents not

misleading.  *See* Pl.'s Resp. 21-22.  Accordingly, Town North's Rule 10b-5 claim with respect to

omissions is based on the offering documents, many of which were issued more than five years

before this lawsuit was initiated on November 11, 2011.

Further, any contention by Town North that Defendants' failure to provide information

necessary to correct or make prior false statements in the offering documents not misleading

**Memorandum Opinion and Order - Page 14**

constitutes a separate securities violation with a separate tolling date is akin to a continuing wrong theory based on equitable tolling that has been rejected by courts in this district. *See In re Affiliated Computer Servs. Derivative Litig.*, 540 F. Supp. 2d 695, 701 (N.D. Tex. 2007) (rejecting plaintiffs' continuing wrong theory and argument that federal securities claim based on the "the issuance of a further financial statement that failed to correct the prior false statement" made in time-barred filings was not barred by statute of repose); *Wolfe v. Bellos*, No. 3:11-CV-02015-L, 2012 WL 652090, at *6 (N.D. Tex. Feb. 28, 2012) ("Wolfe's fraudulent scheme argument based on Bellos's ongoing misrepresentations is akin to a continuing wrong or fraudulent concealment theory premised on equitable tolling. Statutes subject to a statute of repose, however, are not subject to equitable tolling.").

Accordingly, Town North's allegations and contention that Defendants failed to correct prior, time-barred, false statements in the offering documents do not toll the statute of repose. Because this suit was not filed until November 11, 2011, the court concludes that Town North's section 10(b) and Rule 10b-5 claims based on omissions by Defendants pertaining to securities with offering documents dated November 10, 2006, or earlier, are barred under the applicable five-year statute of repose. Dismissal of these claims is therefore appropriate.[5] This does not dispose of all of Town North's federal securities claims. Those that survive the statute of repose, however, fail for other reasons.

---

[5] Plaintiff's claims based on securities with offering documents issued November 10, 2006, or earlier, that are barred by the statute of repose are identified in the attached chart of securities that form the basis of Plaintiff's claims in this case. These time-barred claims also fail for the other reasons explained in this opinion.

**B.      Claim Based on Alleged Pre-Sale Omissions (All Defendants)**

    **1.      Duty to Disclose**

        *a.      The Parties' Contentions*

With respect to the first category of alleged omissions, Defendants contend, based on the reasoning in *Janus Capital Group v. First Derivative Traders*, 131 S. Ct. 2296 (2011), and the allegations in the Amended Complaint, that they are not the "makers" of the securities offering documents or the credit rating statements contained in those documents because they did not issue or author any such documents.   Defendants further assert that any alleged misstatements or inaccuracies regarding credit ratings were made by the credit rating agencies, not the issuers or sellers of the securities.   Defendants therefore contend that they had no duty to disclose or correct any allegedly misleading statements in the offering documents when they sold the securities to Town North, and that they cannot be liable for failing to disclose information that Town North maintains was not publicly available.   Defendants contend that they owed no fiduciary relationship to Town North in their role as securities brokers.   The Bank Defendants maintain that Town North has expressly disclaimed the existence of any formal fiduciary relationship with respect to them and that, while Town North alludes to the existence of a "personal" relationship with Defendants, it fails to explain what it means by "personal" relationship and why such a relationship would create an affirmative duty of disclosure.

Defendants contend that, even assuming they had an affirmative disclosure obligation, Town North's pleadings regarding alleged misrepresentations and omissions are far too generic and disconnected from the facts in this case to satisfy Rule 9(b) and the PSLRA.   Shay similarly asserts that the Amended Complaint, while long-winded, is a text book example of what the court in *ABC*

*Arbitrage Plaintiffs Group* referred to as "conclusory allegations or legal conclusions masquerading as factual conclusions." Shay's Br. 6 (quoting *ABC Arbitrage Plaintiffs Grp.*, 291 F.3d at 348). Defendants contend that Town North fails to identify any statements in the offering documents that were allegedly false or misleading in light of the allegedly omitted information, and the Amended Complaint fails to allege with particularity facts regarding the identity of the speakers, the location where the statements or omissions were made, and the dates when the alleged statements or omissions occurred.

Defendants contend that Town North's sweeping, conclusory assertions regarding credit ratings for all RMBS and CDOs issued during 2006 to 2007, based on a 2011 report prepared by the Federal Reserve Bank of Philadelphia ("FRB Study"), are insufficient to plead any actionable omission by Defendants because courts have "resoundingly rejected such attempts to base securities claims on generalized market allegations rather than allegations of specific facts relating to the particular transactions at issue." Bank Defs.' Br. 21-22. Defendants contend that, while Town North generally alleges that credit ratings from 2006 to 2007 were flawed based on market commentary, it never ties this allegation to any specific claim about the process or inputs used to create the ratings for the particular securities purchased by Town North. Defendants further assert that it is insufficient for Town North to simply allege that the credit ratings were based on inaccurate assumptions or were otherwise "faulty" or "incorrect." *Id.* at 22.

In addition, Defendants contend that the FRB Study does not support the limited proposition for which Town North offers it, that is, that the correlation input assumptions used for the credit ratings at issue in this case were inaccurate. Defendants maintain that the FRB Study does not address the particular transactions at issue in this case or even the credit ratings for securities of the

relevant type.  Defendants contend that the study is silent as to credit ratings for individual RMBS and nonRMBS of the kind purchased by Town North and therefore is inapplicable to Town North's claims.

Town North counters that its claims are not based on false or misleading statements in the offering documents but instead on Defendants' knowing failure to disclose that the securities sold to it "had so deteriorated in value at the time of sale in 2007 that the risks disclosed and the ratings assigned to the securities were no longer accurate or reliable." Pl.'s Resp. 10.[6]  Town North contends that Defendants' duty to speak instead derives from "selling proprietary securities created by their affiliates and not disclosing material, nonpublic information" that would have revealed that the risks and ratings disclosed in the offering documents for the securities were no longer accurate, complete, or reliable by the time Defendants sold the securities to Town North.  *Id*. at 6, 10; Pl.'s Resp. to Shay's Mot.  6.  In this regard, Town North reasons as follows as to why it believes the Bank Defendants, and presumably Shay, had a duty to speak:

> Defendants were selling securities structured or underwritten by their affiliates, not securities they were buying from strangers in impersonal market transactions.  *Thus, as agents for their affiliates in the structuring, underwriting or marketing of these securities, [] Defendants sold these securities to Plaintiff and presented the written offering documents as part of the sale.  Even though Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete.*  At a minimum, once [] Defendants offered for sale to Plaintiff a security with a rating of AAA, they had a duty to provide the information they knew or should have known showing the assumptions and data supporting such rating was not accurate or reliable and the rating was inflated.

Pl.'s Resp. 21-22 (emphasis added) (internal citations omitted).

---

[6] In responding to Shay's motion to dismiss, Plaintiff incorporated the arguments in response to the Bank Defendants' motion to dismiss.  For purposes of clarity, the court will cite to "Pl.'s Resp." when referring specifically to Plaintiff's response to the Bank Defendants' motion and "Pl.'s Resp. to Shay's Mot." when the referring to arguments raised in Plaintiff's response to Shay's motion.

**Memorandum Opinion and Order - Page 18**

Town North contends that the Bank Defendants' reliance on *Janus* is misplaced because it has alleged, and believes that discovery will show, that Defendants knew the information in the offering documents was no longer accurate:

> [E]ach Defendant, because of the communication within and among each Bank Defendant's affiliates described in the FRB Study and in the organization['s] desire to clear its books of these deteriorating securities in 2007, knew and failed to disclose to Plaintiff a risk of loss greater than any of the offering circulars contained and which, if disclosed, would have caused Plaintiff not to buy the securities.

Pl.'s Resp. 10 n.13.  Town North contends that it has adequately pleaded the fraud practiced by Defendants and their affiliates.  *Id*. at 6 (citing Pl.'s Am. Compl. ¶ 27).  Town North asserts that "[t]he data provided to rating agencies resulted in inflated ratings for the securities sold to Plaintiff," and that "Wall Street banks were able to artificially inflate security ratings" by "manipulating or withholding data supplied to the ratings agencies."  Pl.'s Resp. 7.  Town North maintains that, because Defendants had nonpublic knowledge of the securities ratings manipulation and risk and "had enjoyed long term relationships with Plaintiff," they had a duty to disclose all material information that it needed to purchase the securities.  *Id.*

Additionally, Town North contends that it has alleged sufficient facts regarding the small market for the securities it purchased, the personal communications it had with the brokers or traders for each Defendant, and other facts in support of its contention that the trades were not impersonal market trades.  Town North contends that the securities transactions at issue were not anonymous public market transactions but instead involved the sale of securities from Defendants' institutional trading desks to a small and known group of purchasers like itself.  Town North therefore contends that each agent of each Defendant that sold securities to Town North in 2007 was either an insider

or temporary insider, not an unrelated third party such as the defendant in *Chiarella v. United States*, 445 U.S. 222, 234-35 (1980).

Alternatively, Town North maintains, based on the FRB Study, that the Bank Defendants were insiders under Rule 16(b) of the Exchange Act "by virtue of the centralized trading desks within their offices and the affiliated relationship they had with the issuers and underwriters of the securities." *Id*. at 8. According to Town North, "[t]hrough these relationships, the Bank Defendants were given access to information used to bundle, rate, and issue these securities." *Id.* Town North therefore argues that the Bank Defendants' status as insiders and their possession of material nonpublic information regarding the risk of the securities created a duty for them to either disclose the information or abstain from selling the securities. *Id.* at 9 (quoting *Chiarella*, 445 U.S. at 227, for the proposition that "insiders must disclose material facts which are known to them by virtue of their position but which are not known to persons with whom they deal and which, if known, would affect their investment judgment."). Town North similarly contends that Shay was an insider and had a duty of disclosure or abstention because, as the distributor for its affiliate's AMF Funds, it was "privy to material and nonpublic information that was sufficient to cause AMF Funds to divest their own portfolios of RMBS." Pl.'s Resp. to Shay's Mot. 5.

Defendants reply that they are unaware of any authority supporting the "personal communications" theory of disclosure advocated by Town North, and that Town North does not provide any such authority. Bank Defs.' Reply 4. Defendants also contend that it is unclear whether Town North alleges that it had personal dealings with all of the Bank Defendants or just certain Bank Defendants because it alludes to "personal and professional" relationships with individuals at some banks in its Amended Complaint but alleges only a "professional" relationship with traders at

**Memorandum Opinion and Order - Page 20**

Morgan Stanley.  *Id*. at n.1.  Defendants further assert that, while Town North alleges that the securities market was "small," it fails to explain why this fact is relevant to the issue of whether Defendants had a duty of disclosure.  *Id.* at n.2.  Defendants contend that the size of the securities market is irrelevant.  Alternatively, Defendants contend that, even if relevant, Town North's contention regarding the small market is not supported by the FRB Study on which it relies. According to Defendants, the FRB Study instead indicates that there were approximately $5.59 trillion RMBS and $641 billion CDO issuances between 1998 and 2007.

Defendants contend that Town North has not pleaded and its Amended Complaint does not mention insider trading law under Rule 16(b) of the 1934 Securities Act.  Defendants contend that, even assuming Plaintiff's amended pleadings can be construed to plead a securities violation  based on insider trading, its arguments in this regard misconstrue insider trading law, which, according to Defendants, does not apply to any of the transactions at issue here and does not create a duty of disclosure.  Defendants also maintain that insider trading theory is inapplicable on its face to the various secondary market transactions in which the Bank Defendants sold securities issued by unaffiliated entities.

In addition to the arguments asserted by Defendants, Shay contends that, unlike Town North's contentions and allegations that the Bank Defendants were privy to undisclosed information because their affiliates created and structured similar securities, the Amended Complaint merely alleges that Shay was aware of an affiliate's decision to sell, rather than retain, similar unspecified securities at some unspecified date in 2007.  Shay contends that, while Town North alleges that the Bank Defendants were aware of an alleged credit ratings manipulation scheme, it does not allege that the same is true of Shay. Shay further contends that Town North fails to identify, in the Amended

**Memorandum Opinion and Order - Page 21**

Complaint or in response to Shay's motion to dismiss, the securities for which Shay allegedly had nonpublic information, the nonpublic information that Shay allegedly had in its possession, or the time frame when Shay obtained the information.

> b.   *Discussion*

For the reasons that follow, the court concludes that Town North's Rule 10b-5 claim based on the first category of alleged omissions fails because Defendants did not "make" the statements in the offering documents and were not required to disclose information to make the allegedly false statements in the offering documents regarding risk not misleading at the time Town North purchased the securities.  Town North indicates in the "Claims for Relief" section of its Amended Complaint that its federal securities claim is being brought pursuant to sections (a), (b), and (c) of the Rule 10b-5.  *See* Pl.'s Am. Compl. ¶ 196.  In this same section, Town North alleges that Defendants, "[a]s part of and in furtherance of their scheme . . . , directly and indirectly, prepared, disseminated, or used advertisements, contracts, promotional materials, and investor and other correspondence." *Id.* ¶ 197.  There are no factual allegations in the Amended Complaint, however, regarding such conduct by Defendants.  Town North's pleadings instead focus solely on alleged misrepresentations and omissions by Defendants.  The court therefore construes Town North's claim as one for alleged federal securities violations under Rule 10b-5(b), not 10b-5(a) or (c).[7]

---

[7] Town North also contends for the first time in response to Defendants' motions to dismiss that Defendants had a duty as insiders to disclose nonpublic information not included in the offering documents. As herein explained, trading on insider information qualifies as a "deceptive device" under sections 10(b) and 10b-5(a) and (c). Town North, however, has not alleged a claim against Defendants for insider trading and does not seek to hold Defendants liable on this basis. Town North instead relies on an insider trading theory to support its claim based on misrepresentations and omissions and its contention that Defendants, as insiders, had an affirmative duty of disclosure. Regardless of the purpose for which Town North relies on an insider trading theory, the court concludes that the allegations in the Amended Complaint are insufficient to support a claim based on insider trading or a duty of disclosure.

As previously noted, Rule 10b-5(b) makes it unlawful "[t]o make any untrue statement of a material fact" or to omit "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  In *Janus*, the Supreme Court addressed the scope of Rule 10b-5(b) and the Rule's language that provides it is "'unlawful for any person, directly, or indirectly, . . . [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities." *Janus*, 131 S. Ct. at 2301 (quoting 17 C.F.R. § 240.10b-5).

The Court in *Janus* considered whether Janus Capital Management LLC ("JCM"), a mutual fund investment adviser, could be liable under Rule 10b-5(b) for false statements included in its client mutual funds' prospectuses.  *Id.* at 2299.  The mutual funds in *Janus* were created by Janus Capital Group, Inc. ("JCG") and organized in a Massachusetts business trust, Janus Investment Fund, which retained JCG's wholly owned subsidiary, JCM, to be its investment adviser and administrator. *Id.*  Janus Investment Fund issued prospectuses describing the investment strategy and operations of its mutual funds to investors.

Plaintiff First Derivative Traders ("First Derivative"), which represented a class of plaintiffs who owned JCG stock, contended in the district court that JCG and JCM "materially misled the investing public" and that class members relied "upon the integrity of the market price of [JCG] securities and market information relating to [JCG and JCM]." *Id.* at 2301 (citation omitted).  First Derivative also alleged that JCG should be liable for the acts of its subsidiary JCM. *Id.*  The district court dismissed First Derivative's complaint for failure to state a claim.  The Fourth Circuit reversed, holding that First Derivative had sufficiently alleged that:

> "JCG and JCM, by participating in the writing and dissemination of the prospectuses, made the misleading statements contained in the documents." With respect to the element of reliance, the court found that investors would infer that JCM "played a role in preparing or approving the content of the Janus fund prospectuses," but that investors would not infer the same about JCG, which could be liable only as a "control person" of JCM under § 20(a) [of the Exchange Act]."

*Id.* (internal citations omitted).

Based on the language in Rule 10b-5(b), *Janus* concluded that, for the mutual fund investment advisor (JCM) to be liable under Rule 10b-5(b), it must have "made" the material misstatements in the prospectuses and reversed the decision of the Fourth Circuit. *Id.* The *Janus* Court explained:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

> This rule follows from *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.*, 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed.2d 119 (1994), in which we held that Rule 10b-5's private right of action does not include suits against aiders and abettors. *See id.*, at 180, 114 S. Ct. 1439. Such suits—against entities that contribute "substantial assistance" to the making of a statement but do not actually make it—may be brought by the SEC, *see* 15 U.S.C.A. § 78t(e), but not by private parties. A broader reading of "make," including persons or entities without ultimate control over the content of a statement, would substantially undermine *Central Bank*. If persons or entities without control over the content of a statement could be considered primary violators who "made" the statement, then aiders and abettors would be almost nonexistent.

*Id.* at 2302 (footnote omitted).   Because the allegedly false statements in the mutual fund prospectuses were made by and subject to the control of Janus Investment Fund, and nothing in the prospectuses indicated, either explicitly or implicitly, that the statements in the prospectuses were made by the investment adviser (JCM), the court in *Janus* reversed the judgment of the Fourth Circuit and held that JCM, which acted as the administrator for the investment fund, could not be held liable under Rule 10b-5(b), even though it may have significantly assisted in preparing the prospectuses. *Id.* at 2304-05. *Janus* noted that JCM's providing "access to Janus Investment Fund's prospectuses on its Web site is also not a basis for liability. Merely hosting a document on a Web site does not indicate that the hosting entity adopts the document as its own statement or exercises control over its content." *Id.* at 2305 n.12.

Town North unpersuasively attempts to distinguish *Janus* by contending that Defendants provided the securities offering documents to Town North and were aware that information in the offerings documents pertaining to risk was no longer accurate.   These arguments, however, are foreclosed by the holding in *Janus* because Town North attributes the allegedly misleading statements in the offering documents to Defendants' affiliates, the issuers of the offerings documents, and the credit rating agencies.   Town North fails to allege any facts which, if proved, would establish that the allegedly misleading statements in the offering documents were made by Defendants.   Specifically, the Amended Complaint contains no allegations from which the court could reasonably infer that Defendants, as broker-sellers of the securities, had "ultimate authority" over the statements in the offering documents and whether and how to communicate such information, and *Janus* makes clear that "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *Id.* at 2302.

**Memorandum Opinion and Order - Page 25**

*Janus* also rejected an argument similar to that asserted by Town North—that Rule 10b-5 liability can be imposed on a party that merely publishes or delivers a misleading statement made by another when a "close relationship" or affiliation exists between the two entities:

> First Derivative suggests that the "well-recognized and uniquely close relationship between a mutual fund and its investment adviser" should inform our decision. It suggests that an investment adviser should generally be understood to be the "maker" of statements by its client mutual fund, like a playwright whose lines are delivered by an actor. We decline this invitation to disregard the corporate form. Although First Derivative and its amici persuasively argue that investment advisers exercise significant influence over their client funds, it is undisputed that the corporate formalities were observed here. JCM and Janus Investment Fund remain legally separate entities, and Janus Investment Fund's board of trustees was more independent than the statute requires. Any reapportionment of liability in the securities industry in light of the close relationship between investment advisers and mutual funds is properly the responsibility of Congress and not the courts. Moreover, just as with the Government's theory, First Derivative's rule would create the broad liability that we rejected in *Stoneridge*.

*Id.* at 2304.  Like *Janus*, the Amended Complaint is devoid of any allegations from which the court could reasonably infer that Defendants and their affiliates are not legally separate entities or that corporate formalities were not observed here.  *See id.*  Moreover, Town North's allegations based on the FRB Study regarding the "vertical integration" of the Bank Defendants and their affiliates are far too general to support a Rule 10b-5(b) claim for Defendants' failure to correct allegedly misleading statements in the offering documents that were *made by others*.  The Amended Complaint also lacks specific allegations to support Town North's conclusory assertion that Defendants were acting as agents for their affiliates in presenting the offering documents and selling the securities is unavailing.  Accordingly, under *Janus* and the facts alleged the Amended Complaint, any misstatements in the offering documents were made by either Defendants' affiliates or the credit rating agencies, not Defendants. As Defendants did not make any of the allegedly fraudulent or

**Memorandum Opinion and Order - Page 26**

misleading statements in the offering documents, they cannot be held liable for such statements or omissions with respect to the information in the offering documents absent a duty to disclose such information.

Town North's contention that its Rule 10b-5 claim is based on Defendants' omissions rather than the offering documents does not change the result because, as previously explained, the only affirmative statements alleged to be misleading are those in the offering documents. Specifically, with respect to its claim based on omissions by Defendants, Town North repeatedly alleges that Defendants had a duty to speak because they knew that the offering documents prepared by Defendants' affiliates contained inaccurate or outdated information regarding the riskiness of the securities, *but they failed to disclose material nonpublic information in their possession that was necessary to make the statements in the offering documents, at the time of sale, not misleading*. Accordingly, Town North's Rule 10b-5 claim with respect to omissions is based on the offering documents, and Town North's allegation that Defendants possessed material nonpublic information is of no moment unless they had a duty to disclose such information. *See Chiarella*, 445 U.S. at 235 ("[M]ere possession of nonpublic market information" does not give rise to a duty to speak.).

"'When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.'" *Central Bank of Denver, N.A.*, 511 U.S. at 174 (quoting *Chiarella*, 445 U.S. at 234-35). A duty to disclose only arises "because of a fiduciary or other similar relation of trust and confidence between [parties]." *Chiarella*, 445 U.S. at 228. A duty to disclose "does not arise from the mere possession of nonpublic market information." *Id.* at 235. Further, there is no general duty for a company to speak whenever a material development occurs. *Id.* at 226. Absent a specific duty to disclose material information, silence is not a basis for Rule 10b-5 liability. *Basic, Inc. v.*

*Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

In its Amended Complaint, Town North alleges with respect to the Bank Defendants:

> The other [Bank] Defendants brought a status and reputation that Plaintiff relied upon in its direct dealings with them.  Plaintiff was an institutional adviser and established a personal relationship with the individual brokers of each of these broker [Bank] Defendants. While Plaintiff does not allege that these other [Bank] Defendants had a fiduciary duty to Plaintiff, Plaintiff does allege a duty to speak by each Defendant, based on the personal relationships and particularized facts alleged herein.

Pl.'s Am. Compl. ¶ 15. With respect to its relationship with Shay, Town North alleges:

> Shay established a relationship of trust and confidence with Plaintiff no later than 1998, and became Plaintiff's trusted adviser.  A special relationship of trust and confidence was established such that Shay assumed a fiduciary duty to Plaintiff. Plaintiff developed trust and confidence in Shay over the many years of their relationship.

Pl.'s Am. Compl. ¶ 15.  Town North similarly alleges: "Going back at least to 1998, Shay's representatives developed a close personal and professional relationship with Plaintiff's representatives.  Shay became a trusted adviser to Plaintiff, upon whom Plaintiff came to rely, to recommend the selection of assets for Plaintiff to purchase and the source of funding for the purchases."  *Id.* ¶ 77.  In addition, Town North alleges that Shay taught it how to buy risky investments on margin:

> Long before the transactions in this suit, Shay taught Plaintiff that [it] could purchase AAA-rated RMBS and borrow from the Federal Home Loan Bank ("FHLB"), using the purchased RMBS as collateral for the loan.  Shay taught Plaintiff that the RMBS could be bought at a tranche level that paid a higher rate of return than Plaintiff's borrowing cost.  The idea was that Plaintiff would earn money on "spread" in interest rates and later, if necessary, Plaintiff would sell the security to reduce indebtedness to FHLB.  Thus, Shay taught Plaintiff how to buy risky investments on margin. Shay describes its "History of Helping Financial Institutions," and touts its "spread manager:" "Shay has developed a powerful

**Memorandum Opinion and Order - Page 28**

analytic tool, designed specifically for financial institutions, to evaluate bonds in the same way that they evaluate loans–in terms of Spread."

*Id.* ¶ 78.   According to Town North, the quoted language above is from the "Our History" and "Portfolio Strategies Group" pages of Shay's website.   *Id.* at n.7.   Town North contends that in sharing its strategy for purchasing risky securities, Shay recommended a selection of assets for Town North to purchase.   Pl.'s Resp. to Shay's Mot. 12.   Town North therefore contends that Shay's role extended beyond that of a broker-dealer and arms-length business relationship to one in which Shay acquired fiduciary duties and assumed the role of monitoring and advising it on investments.   Town North contends that Shay also assumed a role of monitoring its assets and providing advice by making presentations and recommendations to Town North's board of directors "about how to handle the securities even after the sales."   *Id.* at 13.   The court disagrees.

Town North acknowledges that a formal fiduciary relationship did not exist between it and the Bank Defendants.   Moreover, the Supreme Court recognized in *Chiarella* and *Affiliated Ute Citizens v. United States*, that when a broker merely acts as a transfer agent for an investor, no duty of disclosure exits.   *Chiarella*, 445 U.S. at 230 (discussing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152 (1972).   While the duty owed by a broker to an investor necessarily varies depending on the relationship between the broker and investor, a broker's duty is generally limited to executing the investor's order when "the investor controls a nondiscretionary account and retains the ability to make investment decisions." *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998); *see also SEC v. Zandford*, 535 U.S. 813, 823 (2002) (discussing *Chiarella* and explaining why the imposition of a fiduciary duty is appropriate in broker-investor relations involving discretionary accounts: "The benefit of a discretionary account is that it enables

individuals, like the Woods, who lack the time, capacity, or know-how to supervise investment decisions, to delegate authority to a broker who will make decisions in their best interests without prior approval. If such individuals cannot rely on a broker to exercise that discretion for their benefit, then the account loses its added value.").

Town North does not allege here that either the Bank Defendants or Shay had discretionary authority to make decisions regarding Town North's accounts without its prior approval. Town North instead acknowledges that it selected and purchased the securities in its portfolio. Moreover, unlike *Affiliated Ute Citizens*, Town North does not allege any facts from which the court reasonably could infer that Defendants assumed the duty to act on behalf of Town North. *See Chiarella*, 445 U.S. at 230; *Affiliated Ute Citizens*, 406 U.S. at 152-53 (concluding that the defendant bank expressly assumed the duty to act on behalf of tribe members when it promised the tribe members in a letter that 'it would be our duty to see that these transfers were properly made' and that, with respect to the sale of shares, 'the bank would be acting for the individual stockholders.'").

Town North alleges that the Bank Defendants had a duty to speak "based on the personal relationships and particularized facts alleged herein"; however, the Amended Complaint contains no "particularized facts," and Town North's response does not specifically address the Bank Defendants' contention that Town North's allegation regarding "personal relationships" lacks a factual basis. The only allegations the court was able to locate in the Amended Complaint regarding the relationships between Town North and the Bank Defendants are as follows:

• Bear Stearns: "Plaintiff was introduced to Bear Stearns by an individual who was a personal and professional contact of Plaintiff's representative and who had moved from another broker to Bear Stearns. Through this relationship, Plaintiff purchased the security that is the subject of this lawsuit." Pl.'s Am. Compl. ¶ 110.

- Merrill Lynch: "Plaintiff established a personal and professional relationship with a Merrill Lynch broker in Dallas, Texas. Through this relationship, Plaintiff purchased securities for its investment portfolio and Plaintiff was given the opportunity to participate in the original issues that are the subject of this lawsuit." *Id.* ¶ 128.

- Morgan Stanley: "Plaintiff's representatives developed professional relationship with traders on Morgan Stanley's institutional trading desk in New York City, with whom they dealt, mostly by phone, with an occasional face to face meeting in New York. The purchases in [this] suit were arranged via these known contacts between Plaintiff and Morgan Stanley." *Id.* ¶ 149.

- UBS: "Plaintiff's representative had a personal and professional relationship with a UBS broker in Texas for many years. Through this relationship, Plaintiff purchased securities from UBS. The UBS representative was not an expert on RMBS or CDO type investments and referred Plaintiff's representative to another UBS individual in another state. It was through the referral relationship that Plaintiff acquired the securities on which it now brings suit." *Id.* ¶ 173.

These allegations are conclusory and insufficient to transform an arms-length securities transactions between a broker and seller into a fiduciary relationship or one based on trust and confidence.[8]

Town North's argument that Defendants had a duty of disclosure as insiders or temporary insiders of their affiliates fares no better. Town North correctly notes that when a corporate insider trades on confidential information, a duty of disclosure arises. *Chiarella*, 445 U.S. at 228-29. Town North appears to rely on the "traditional" and "classical" theories of insider trading. Under these theories, section 10(b) and Rule 10b-5 "are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

"Trading on such information qualifies as a 'deceptive device' under § 10(b) . . . because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those

---

[8] A more detailed discussion as to why the allegations in the Amended Complaint are insufficient to justify imposition of a fiduciary relationship between Town North and Shay is included in Section IV.

insiders who have obtained confidential information by reason of their position with that corporation.'" *Id.* at 652 (quoting *Chiarella*, 445 U.S. at 228).  Such relationship "gives rise to a duty to disclose [or to abstain from trading] because of the 'necessity of preventing a corporate insider from . . . tak[ing] unfair advantage of . . . uninformed . . . stockholders.'" *O'Hagan*, 521 U.S. at 652 (quoting *Chiarella*, 445 U.S. at 228-29).  A "core principle" of the classical theory is that "the duty to disclose or abstain is derived from the corporate insider's duty to his shareholders." *SEC. v. Cuban*, 620 F.3d 551, 554 (5th Cir. 2010).  The classical theory of insider trading applies to "officers, directors, and other permanent insiders of a corporation," as well as "attorneys, accountants, consultants, and others who temporarily become fiduciaries of a corporation." *O'Hagan*, 521 U.S. at 652 (quoting *Dirks v. SEC*, 463 U.S. 646, 655 n.14 (1983)).  Consequently, "even an individual who does not qualify as a traditional insider may become a 'temporary insider' if by entering 'into a special confidential relationship in the conduct of the business of the enterprise [they] are given access to information solely for corporate purposes.'" *Cuban*, 620 F.3d at 554 (quoting *Dirks*, 463 U.S. at 655 n.14).

Insider trading allegations are normally asserted either in support of a claim based on insider trading or as motive and opportunity allegations to support an inference of scienter.  Town North does neither.  It instead relies on the classical theory of insider trading to support its contention that Defendants, as insiders, had an affirmative duty of disclosure that would not otherwise exist. Regardless of Town North's reasons for alleging insider trading in response to the motions to dismiss, Town North has not pleaded with particularity facts to support its allegation, based on information and belief, that Defendants were privy to insider information regarding the riskiness of the securities.  *See Magruder v. Halliburton Co.*, No. 3:05-CV-1156-M, 2009 WL 854656, at *4

(N.D. Tex. Mar. 31, 2009) ("[T]o survive a motion to dismiss where the plaintiff alleges fraudulent omissions or incomplete disclosures, the plaintiff must plead with particularity the facts that give rise to a duty to disclose the material information, or the failure to do so will not be actionable."). Specifically, for the reasons explained in more detail in the section that follows regarding scienter, Town North's allegations that the Bank Defendants were aware or should have been aware of material nonpublic risk information in the possession of their affiliates, based on the FRB Study, and that Shay was aware of material nonpublic risk information because it acted as the distributor of a mutual fund managed by its affiliate that contained unspecified RMBS and ABS, are not sufficiently specific.

Town North's allegation that the offering documents contained misleading information is similarly insufficient. The Amended Complaint refers generally to information in the offering documents regarding risk, but it fails to identify the specific statements in the offering documents alleged to be misleading due to the omissions. *See In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 892 (N.D. Tex. 2005) (concluding that the PSLRA requires a plaintiff to specify the statements alleged to have been misleading "in the same manner as a misrepresentation, i.e., the who, what, when, and where.").

Accordingly, for all of the forgoing reasons, the Amended Complaint has not alleged an actionable omission or duty of disclosure based on the relationships of the parties and fails to satisfy the pleading standard under Rule 9(b) and the PSLRA.

2.      **Scienter**

a.      *The Parties' Contentions*

The Bank Defendants contend that Town North's allegations, with respect to them, regarding scienter based on the FRB Study are conclusory and insufficient to create a strong inference of scienter.  The Bank Defendants further assert that scienter cannot be inferred from Town North's allegations that they had motive and opportunity because of the market positions taken by their affiliates. In this regard, the Bank Defendants maintain that scienter cannot be inferred from Plaintiff's allegations that the transactions involved credit default swaps because the credit default swaps were legitimate transactions and the swap counterparty role played by the affiliates of certain Bank Defendants was disclosed.  Bank Defs.' Br. 27 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007)).  In addition, the Bank Defendants maintain that Town North's allegations regarding credit default swaps are inapplicable to Defendants J.P. Morgan, as successor in interest to Bear Stearns, or Merrill Lynch with respect to U.S. Capital Funding VI, Ltd., because these transactions are not alleged to have involved and did not involve credit default swaps.

Shay similarly contends that Town North's allegations that it "knew or should have known" various facts regarding the riskiness of the securities at issue are not sufficiently specific to create a strong inference of scienter.  Shay asserts that Town North's allegation that it had "superior knowledge" regarding the performance of the securities it sold in the secondary market is likewise deficient because it is not supported by any facts in the Amended Complaint.  In addition, Shay contends that although Town North relies heavily on the downgrade of RAST 2006-A16, it does not allege that Shay knew or should have known that the downgrade was forthcoming. Regarding RAST 2006-A16, Shay asserts that:

**Memorandum Opinion and Order - Page 34**

Throughout the Complaint, Plaintiff uses the downgrade of this single security as an incantation, allegedly showing that every security Shay Financial sold to Town North suffered from undisclosed defects in quality at the time of its purchase. (*See, e.g.*, Compl. ¶ 94.) Plaintiff fails to explain why a downgrade in one security would put Shay, but not Town North, on notice that its entire portfolio was flawed. Information on the downgrade was publicly-available, (*see* Appx. Ex. C.), and therefore even if it were relevant to any other security, the downgrade of RAST 2006-A16 was not an actionable omission.

Shay's Br. 7 n.4.   Shay also takes aim at Town North's motive and opportunity allegations, contending that:

The only allegation that touches on scienter is that a Shay affiliate, Shay Assets Management, sold some RMBS and ABS at some unspecified date in 2007. Town North alleges that this gave Shay "motive and opportunity to divest itself and its affiliates of deteriorating securities by selling them to Plaintiff and distributing them to other financial institutions clients of Shay managed funds, creating a strong inference of scienter," but does not allege Shay in fact did divest itself or its affiliates of these securities by selling them to Plaintiff. "It is well established that bare allegations of motive and opportunity will not suffice to demonstrate scienter[.]" Town North thus fails to plead scienter with particularity under Rule 9(b) and fails to create the "strong inference" of scienter required under the PSLRA.

Shay's Br. 15-16.

Plaintiff counters that its pleadings satisfy the scienter requirement because, "[t]hrough the pleading of a combination of circumstantial and direct evidence, along with pleading motive and opportunity, [it] has meaningfully enhanced the strength of the inference of scienter." Pl.'s Resp. 26.  With respect to the Bank Defendants, Town North asserts, based on information and belief, that affiliates of these Defendants structured, marketed, and sold the securities at issue to reduce their long exposure to risk by betting against them.  According to Town North, affiliates of the Bank Defendants "knew or, but for reckless disregard for [the] truth should have known, that the collateral in the security would decline in value and intentionally took a short position in the likely event the collateral would perform poorly." Pl.'s Resp. 25.  Town North contends that the Bank Defendants

**Memorandum Opinion and Order - Page 35**

were aware of their affiliates' actions in this regard and knew that such information had not been disclosed to Town North.  Town North therefore maintains that the "Bank Defendants['] and affiliates' actions strongly indicate that they in fact saw the risks and, in consequence, maneuvered to avoid them." *Id.* (citation and internal quotation marks omitted).

In addition, Town North asserts that the Bank Defendants' "affiliates' hedge against the expected losses, to protect their financial position, at the expense of Plaintiff and other investors, creates a strong inference of Bank Defendants' motive and opportunity as well, such that someone whose actions or intent could be imputed to the corporation acted with the requisite scienter." *Id.* According to Town North, the "Bank Defendants needed to purge their books of these underperforming securities to avoid substantial losses of their own," and "[g]iven the historical relationship between Shay, the Bank Defendants, and Plaintiff, the Bank Defendants had both motive and opportunity to unload these securities." *Id.* at 25-26.

With respect to Shay, Town North contends that it has alleged the following facts, which describe Shay's mental state and show that "Shay had motive and opportunity to divest itself and its affiliates of deteriorating securities and to encourage Plaintiff to continue to purchase securities and hold the one Plaintiff had in its portfolios":

> Shay affiliate Shay Assets Management managed a mutual fund in Chicago, for institutional investors, that contained agency and non-agency RMBS and ABS as its asset base.  Shay was the fund's "Distributor."  The net asset value ("NAV") of this fund was deteriorating rapidly in 2007 and, upon information and belief, Shay or its affiliates was transferring securities out of the fund or other securities in its portfolio to fund investors in lieu of cash in order to clear its books.  This was going on even as Shay was selling to Plaintiff the securities identified herein.

*Id.* at 26.

b.      Discussion

After carefully reviewing the factual allegations contained in the Amended Complaint, the court determines that Town North's failure to alleged facts sufficient to raise a strong inference of scienter presents another ground that requires dismissal of Town North's federal securities claim based on omissions.  Town North's allegations regarding scienter consist in large part of conclusory allegations that Defendants were aware of or should have been aware of nonpublic information undisclosed in the offering documents regarding the riskiness of the securities at issue and the likelihood that they would decline in value, but they failed to disclose such information when the securities were sold to Town North.  Town North also alleges that Defendants knew or should have known and disclosed that their affiliates were taking steps to hedge against potential losses from the securities, and that the affiliates' actions in this regard are an indication that Defendants had a motive to get rid of the securities to minimize the affiliates' potential losses.

Town North's allegations fail to raise a strong inference of scienter for a number of reasons. The Amended Complaint does not contain any facts from which the court can reasonably infer that Defendants were aware of the matters alleged.   The allegations in Town North's Amended Complaint instead focus on the alleged conduct and knowledge of Defendants' affiliates rather than Defendants themselves.  In essence, Town North contends that Defendants must have known that the type of securities sold to it were toxic and bound to decline in value because Defendants' affiliates were aware of such matters.  According to Town North, Defendants are imputed with the

knowledge of their affiliates based on the "vertical integration" of Defendants and their affiliates.[9] Town North, however, cites no authority, and the court is aware of none, that stands for the proposition that the mere existence of an affiliate relationship is sufficient to impute the knowledge of one company to another.  Moreover, the Amended Complaint contains no specific facts regarding the communications between Defendants and their affiliates, and except for Shay Assets Management, the Amended Complaint does not identify any of Defendants' affiliates by name.

Town North attempts to link the Bank Defendants and their affiliates, based information in the FRB Study.   Based on this report, Town North alleges that the Bank Defendants had communications with their affiliates regarding the riskiness of the securities purchased by Town North.  According to Town North, the FRB Study "identified the inner workings of the Defendants' affiliates" by describing the "ABS CDO desks" at the major investment banks and asset management firms as the place "where structuring, underwriting and trading took place, and where pricing and fair value information (or 'indicative prices') was generated and exchanged."  Pl.'s Am. Compl.  ¶ 64 (quoting FRB Study at 6).  In its Amended Complaint, Town North concludes, based on the FRB Study, as follows:

> This fact is important because it shows communications between and among representatives within each vertically integrated Defendant group of companies

---

[9] In this regard, Town North alleges in conclusory fashion:

> Due to the vertical integration of these broker defendants (other than Shay) with their affiliated companies, that created, issued, or underwrote the securities involved in this lawsuit, Plaintiff alleges that these Defendants had actual or constructive knowledge of the facts intentionally or recklessly not disclosed to Plaintiff. . . . Shay also had affiliates that managed asset funds and, as alleged herein, Shay is charged with actual or constructive knowledge of facts intentionally or recklessly not disclosed to Plaintiff.  Defendants' affiliates, whose knowledge is imputed to these Defendants, are referred to as such herein.

Pl.'s Am. Compl. 5 n.3.

**Memorandum Opinion and Order - Page 38**

> involved in making and trading toxic subprime RMBS and *also* involved in stuffing those toxic RMBS into CDOs.  This fact shows how tightly integrated each Defendant and its affiliates were during the relevant time, and how Defendants knew or should have known that Defendants' affiliates were placing toxic RMBS and related derivatives into the securities that Defendants sold to Plaintiff in this case."

*Id.* (emphasis in original).

The court has reviewed the portions of the FRB Study cited in the Amended Complaint, and neither it nor the Amended Complaint ties the general findings of the study regarding RMBS and CDOs issued from 2006 to 2007 to the specific securities purchased by Town North.  More importantly, the FRB Study does not lend itself to the expansive conclusions that Town North attributes to it.  The reference in the FRB Study to the structure of certain financial institutions consists of one sentence:  "ABS CDO desks at the major investment banks and asset management firms" are the place "where structuring, underwriting and trading took place, and where pricing and fair value information (or 'indicative prices') was generated and exchanged." Pl.'s App. 53 (FRB Study).  Moreover, the quoted statement in the FRB Study is qualified by the author's acknowledgment that the "central challenge" in conducting the study was to identify or "define the subset of the universe of publicly traded ABS CDOs that were traded at the 'ABS CDO desks' at the major investment banks and asset-management firms."  *Id.*  Thus, the findings in this study are insufficient to support an inference that any of the securities purchased by Town North were traded at the "ABS CDO desks" described in the FRB Study.  For the same reason, it cannot be inferred, as Town North alleges, that the Bank Defendants knew or should have known that their affiliates were placing toxic RMBS and derivatives into the securities purchased by Town North.  While the study addresses securities of the same general type as those purchased by Town North, such a connection is too tenuous and insufficient for purposes of the Rule 9(b) and the PSLRA.

**Memorandum Opinion and Order - Page 39**

Town North's scienter allegations as to Shay's awareness of material nonpublic information regarding are similarly insufficient because Town North does not allege that the allegedly deteriorating securities in the fund managed by Shay's affiliate were the same as those purchased by Town North.  Town North also fails to explain why the decline in value of unrelated RMBS and ABS alerted or should have alerted Shay that the securities purchased by Town North were likely to decline in value.

The Amended Complaint also lacks allegations regarding communications between Shay and its affiliate to support Town North's allegation that Shay was privy to material nonpublic information in the possession of its affiliate.  According to Town North's response to the Bank Defendants' Motion to Dismiss, Shay's office is located in Miami, Florida, whereas its affiliate, Shay Assets Management, is located in Chicago, Illinois, and the Amended Complaint contains no allegations regarding any communications between the two entities.

Additionally, there is nothing in the Amended Complaint, with respect to either Shay or the Bank Defendants, regarding any of the individuals who sold the securities to Town North.  Town North instead contends in conclusory fashion in response to the motions to dismiss that:

> Each individual with whom Plaintiff dealt was acting on behalf of a Defendant as an agent or representative charged with the mental state and scienter of Defendant's organization. Defendants had the requisite mental state and placed their representatives and agents in a position to sell securities Defendants knew or should have known were based on flawed, inaccurate and unreliable data and ratings.

Pl.'s Resp. 2 n.5.  Even assuming that Defendants or the individuals who dealt with Town North on behalf of Defendants were aware of undisclosed risks, "knowledge of omitted facts does not itself establish scienter." *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987); *SEC v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1321 n.17 (5th Cir. 1980).

**Memorandum Opinion and Order - Page 40**

Regarding motive and opportunity, Town North alleges in its Amended Complaint that the Bank Defendants' intentionally took "short" positions in the securities at issue to reduce their "long" exposure in the event the securities performed poorly. Pl.'s Am. Compl. ¶¶ 57, 132-33, 156-57, 178-79; Pl.'s Resp. 25.   Town North contends that the hedges of the Bank Defendants' affiliates against expected losses create a strong inference that the Bank Defendants had motive and opportunity "to unload these securities" to avoid losses. *Id.* at 25-26.   While these allegations by Town North based on the affiliates' conduct may create inference as to motives of the Bank Defendants' affiliates, such allegations, without more, do not create a strong inference that the Bank Defendants had a motive to sell the securities to avoid losses.   Town North's attempt to attribute the motives of Shay's affiliate to Shay is similarly defective.   Absent factual allegations to link or connect the conduct and motives of Defendants and their affiliates, most of whom are not identified, Town North's motive and opportunity allegations amount to nothing more than a theory of scienter based on company affiliation, which is insufficient to give rise to a strong inference of scienter.

Regardless of how the argument is structured, Town North in effect is attempting to attribute or bootstrap the motives of and the benefits to the unidentified affiliates of Defendants that structured the securities to the broker Bank Defendants based on nothing more than general allegations of company affiliation.   "While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable. . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences." *R2 Inv. LDC*, 401 F.3d at 645 (quoting *In re Navarre Sec. Litig.*, 299 F.3d 735, 741 (8th Cir. 2002)). Considering the totality of factual allegations alleged in the Amended Complaint and taking the facts alleged as true, the court determines that Town North's allegations fail to raise a strong inference that any of

**Memorandum Opinion and Order - Page 41**

the Defendants acted with an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant[s] or is so obvious that the defendant[s] must have been aware of it." *R2 Inv. LDC*, 401 F.3d at 643 (quoting *Southland*, 365 F.3d at 366).  Accordingly, dismissal on Town North's federal securities claim based on alleged omissions is appropriate.

### C.   Federal Securities Claim Based on Alleged Pre-Sale Misrepresentation Regarding RAST-2006-A16 (Shay)

As previously noted, Town North alleges with respect to its second category of alleged misrepresentations that, when Shay "pitched" RAST 2006-A16, "Shay's representative told Town North Bank the issue would receive a ratings upgrade.  The opposite was true."  Pl.'s Am. Compl. ¶ 81.  Shay contends that Town North's Rule 10b-5 based on this statement fails because, "[b]esides leaving vague the identity of the alleged speakers, the location of the alleged statements, and the date and/or time of the alleged statements, Plaintiff fails to allege that these statements were false when made."  Shay's Br. 7.

For support, Shay relies on *Rosenzweig v. Azurix Corporation*., 332 F.3d 854, 866 (5th Cir. 2003), for the proposition that "for allegations of fraud, plaintiffs must plead with particularity the identity of the alleged speakers, location of the alleged statements, and the date and/or time of the alleged statements."  Shay also quotes *Berry v. Indianapolis Life Insurance Company*, 600 F. Supp. 2d 805, 817 (N.D. Tex. 2009), to support its contention that alleged misstatements must be "*false when made*" to establish fraud.  In addition, Shay contends that the statement is forward-looking or predictive in nature, and Town North does not allege that it was worded as a guarantee, or that Shay

had any knowledge at the time the statement was made that RAST 2006-A16 would be downgraded in the future by one of the credit agencies.

In response to the arguments raised in Shay's motion to dismiss, Town North cites to and relies primarily on its response to the Bank Defendants' motion in which it maintains that its Amended Complaint "presents facially valid claims that meet the heightened standards of Rule 9(b) and the PSLRA," and notes that "[i]n most cases, at the pre-discovery stage, the allegations in the complaint are not based upon a plaintiff's personal knowledge and thus are based on 'information and belief' regardless of whether they are so characterized." Pl.'s Resp. 3 (quoting *In re Enron Sec. Derivative & ERISA Litig.*, 235 F. Supp. 2d 570 (S.D. Tex. 2002)).

Town North is correct that an allegation regarding a statement or omission may be made on information and belief. This, however, does not relieve it of pleading with particularity "*sufficient* facts" to support its beliefs. *ABC Arbitrage Plaintiffs Grp.*, 291 F.3d at 352 (citation omitted). Thus, pleading based on information and belief is not a "license" for Town North to base its claims of fraud on "speculation and conclusory allegations." *Tuchman*, 14 F.3d at 1068.

Moreover, as correctly noted by Shay, Town North's pleadings with respect to this alleged misrepresentation fail to satisfy Rule 9(b). Town North alleges that it purchased RAST 2006-A16 on March 13, 2007, but it fails to allege when the alleged misrepresentation was made. Town North's allegation that Shay made the statement when it "pitched" RAST 2006-A16 is not sufficiently specific. Based on this allegation, the statement could have been made at the time of the purchase or days, weeks, or even months before Town North purchased RAST 2006-A16. The Amended Complaint also fails to identify who made the statement, where the statement was made, and why the statement was false when made. In addition, for the reasons previously discussed, Town

North's allegations with respect to this alleged misrepresentation fail to raise a strong inference of scienter. Accordingly, Shay is entitled to dismissal of Town North's federal securities claim based on the foregoing statement.

### D.  Federal Securities Claim Based on Alleged Post-sale Misrepresentations or Omissions (Shay)

Shay contends that Town North's Rule 10b-5 claim based on alleged misrepresentations or omissions in 2008 fails because it is based on statements or omissions that occurred *after* Town North purchased the securities from Shay. The court agrees.

Town North alleges that Shay prepared an analysis of RAST 2006-A16 as of September 30, 2007, in which it reported that "this security is rated 'A' by S&P and Fitch as of December 28, 2006[,] and is not subject to a rating downgrade at this time." Pl.'s Am. Compl. ¶ 82. Town North further alleges that, in March and August 2008, Shay represented to Town North's board of directors that the decline in the value of the securities previously purchased by Town North before 2007 was only an aberration due to timing and market unrest. Town North contends that because Shay failed to disclose all it knew about the growing and substantial risk of total loss associated with these securities and RAST 2006-A16, Town North continued to hold the securities rather than sell them and suffered substantial losses. To be actionable under Rule 10b-5, however, a misrepresentation or omission must be made in connection with the purchase or sale of a security. *Dura Pharms., Inc.,* 544 U.S. at 341 (quoting 15 U.S.C. § 78j(b)). Accordingly, Town North's Rule 10b-5 claim based alleged post-sale misrepresentations or omissions fails as a matter of law and will be dismissed.[10]

---

[10] The securities that pertain to Town North's claim based on post-sale misrepresentations or omissions are identified in the attached chart of securities.

**Memorandum Opinion and Order - Page 44**

IV.    **Breach of Fiduciary Duty (Shay)**

Shay contends that Town North has failed to state a claim for breach of fiduciary duty under Texas law because a broker-dealer's duty is generally limited to executing the orders placed by its customers.  Shay asserts that, while brokers who operate discretionary accounts, are viewed as fiduciaries, the Amended Complaint makes clear that Shay did not have such discretion over Town North's accounts and could not make investment decisions without its approval.  Shay therefore contends that its duty was limited to carrying out Town North's trades.  Finally, Shay contends that Town North fails to allege any factual basis to supports its conclusory allegations that Shay "became Plaintiff's trusted advisor," and that "a special relationship of trust and confidence was established such that Shay assumed a fiduciary duty to Plaintiff."  Shay's Br. 20 (quoting and citing Pl.'s Am. Compl. ¶¶ 14, 52, 77, 220, 222, 223).

Town North responds that the allegations in paragraphs 77, 78, 85-86, and 102-105 of the Amended Complaint are sufficient to state a claim for breach of fiduciary duty based on an informal fiduciary relationship.  Town North contends that fact issues regarding the parties' relationship preclude dismissal of its fiduciary duty claim at this stage of the litigation.  Town North asserts that it "believes the evidence as to Shay will show . . . that Shay assumed the role to monitor [its] investments and advise [it] on the spreads achieved and desired on these securities, and any arms'-length business transaction that may have existed between the parties was elevated into a fiduciary relationship by the very nature of [Shay's] actions."  Pl.'s Resp to Shay's Mot. 12 (citation and internal quotation marks omitted).  The court disagrees.

The elements of a breach of fiduciary duty claim in Texas are: "(1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached its fiduciary duty to the

plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant." *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402-03 (5th Cir. 2013) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet denied). "It is well settled that 'not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.'" *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176-177 (Tex. 1997)). When "the underlying facts are undisputed, determination of the existence, and breach, of fiduciary duties are questions of law, exclusively within the province of the court." *National Med. Enters. v. Godbey*, 924 S.W.2d 123, 147 (Tex. 1996) (citation and internal quotation marks omitted).

"Texas law recognizes two types of fiduciary relationships. The first, a formal fiduciary relationship, 'arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers.'" *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007). The second is an informal fiduciary relationship that "may arise where one person trusts in and relies upon another, whether the relationship is a moral, social, domestic, or purely personal one." *Id.* (quoting *Jones*, 196 S.W.3d at 449) (internal quotation marks omitted). Not every relationship involving a high degree of trust and confidence, however, rises to the level of a fiduciary relationship. *Schlumberger Tech. Corp.*, 959 S.W.2d at 176-77. Moreover, "[i]n order to give full force to contracts, [Texas courts] do not create such a relationship lightly." *Id.* at 177.

"To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998). "While the nature of the duty owed by a broker will vary depending on the relationship between the broker and

the investor, where the investor controls a nondiscretionary account and retains the ability to make investment decisions, the scope of any duties owed by the broker will generally be confined to executing the investor's order." *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 412 (5th Cir. 1998).

A claim for breach of fiduciary duty does not necessarily involve fraud; however, when the plaintiff's breach of fiduciary duty claim is based on the same allegations as a fraud claim, Rule 9(b)'s pleading standards apply. *See In re Parkcentral Global Litig.*, 884 F. Supp. 2d 464, 470 (N.D. Tex. 2012) (citing *Litson-Gruenber v. JPMorgan Chase & Co.*, No. 7:09-CV-056-O, 2009 WL 4884426, at *4-5 (N.D. Tex. Dec. 16, 2009)).   Town North's breach of fiduciary duty claim is based on the same allegations as its fraud claim.   Rule 9(b) therefore applies.

 Nothing in the Amended Complaint suggests that Shay had  any discretionary investment authority over Town North's accounts.  *See Martinez Tapia*, 149 F.3d at 412.  Town North alleges that it came to rely on Shay to recommend assets and the source of funding for purchases, but it does not specifically allege that Shay actually recommended any assets or sources of funding.  Moreover, any subjective trust that Town North may have had in Shay is insufficient to transform their business relationship into a fiduciary relationship.  *See id.*; *Schlumberger Tech. Corp.*, 959 S.W.2d at 177) ("[M]ere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship.").

Town North also alleges that in selecting and purchasing the securities at issue in this case, it used an analytical tool and strategy developed by Shay for purchasing risky strategies; however, it does not allege that Shay selected or advised it to buy any of the specific securities that it ultimately selected and purchased.  More importantly, Town North does not allege that Shay ever had authority to act without its approval and direction.  *See Martinez Tapia*, 149 F.3d at 412.  The

allegation that Shay taught it how to purchase risky securities is the only basis for Town North's assertion that it had a "close personal and professional relationship" with Shay before it purchased the securities at issue.  Town North acknowledges in its Amended Complaint, though, that the analytical tool developed by Shay for purchasing securities was marketed and available to all of Shay's financial institution customers.  Thus, at most, the Amended Complaint only supports an inference that the prior transactions between Shay and Town North were arms-length business transactions entered into for the parties' mutual benefit.  *See Associated Indem. Corp.*, 964 S.W.2d at 288.  Even when viewed in the context of Town North's allegation that the parties have done business since 1998, the parties' prior dealings, as alleged in the Amended Complaint, are insufficient to support the imposition of a fiduciary relationship between Shay and Town North under Texas law, based on a special relationship of trust and confidence.  *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 595 (Tex. 1992) ("[T]he fact that the relationship has been a cordial one, of long duration, [is not] evidence of a confidential relationship."). Because Texas law does not recognize a fiduciary duty between Town North and Shay based on the factual allegations in the Amended Complaint, the claim for the breach of fiduciary duty against Shay fails as a matter of law and will be dismissed.

## V.    Common Law Fraud (All Defendants)

Town North's state law fraud claim is based on its contention that Defendants made representations or failed to disclose material information regarding the riskiness of the securities. Town North contends that Defendants had a duty to disclose such information before selling the securities to Town North, and that Town North would not have purchased the securities if it had

known that the value of the securities had materially depreciated and the riskiness of the securities

had substantially increased by the time it purchased the securities. *See* Pl.'s Am. Compl. ¶¶ 207-218.

In Texas, the elements of common law fraud are:

> (1) the defendant made a representation to the plaintiff; (2) the representation was
> material; (3) the representation was false; (4) when the defendant made the
> representation the defendant knew it was false or made the representation recklessly
> and without knowledge of its truth; (5) the defendant made the representation with
> the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and
> (7) the representation caused the plaintiff injury.

*Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1032-33 (5th Cir. 2010)

(citing *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001));

*Flaherty*, 565 F.3d at 212-13. "Fraud by non-disclosure is simply a subcategory of fraud because,

where a party has a duty to disclose, the non-disclosure may be as misleading as a positive

misrepresentation of facts." *Schlumberger Tech. Corp.*, 959 S.W.2d at 181. The elements of fraud

by nondisclosure are:

> (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty
> to disclose those facts; (3) the facts were material; (4) the defendant knew the
> plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity
> to discover the facts; (5) the defendant was deliberately silent when it had a duty to
> speak; (6) by failing to disclose the facts, the defendant intended to induce the
> plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the
> defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting
> without that knowledge.

*7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 508 n.27 (Tex.

App.—Houston [14th Dist.] 2007, pet. denied). As a general rule, a failure to disclose information

does not constitute fraud unless there is a duty to disclose the information. *Bradford v. Vento*, 48

S.W.3d 749, 755 (Tex. 2001) (citing *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674

(Tex.1998)). Thus, silence is equivalent to a false representation "only when the particular

circumstances impose a duty on the party to speak and he deliberately remains silent." *Bradford*, 48 S.W.3d at 755; *Holland v. Thompson*, 338 S.W.3d 586, 598 (Tex. App.—El Paso 2010, pet. denied) ("The failure to disclose information is not actionable unless there is a duty to speak."). The duty to speak arises in the following four situations:

> (1) a fiduciary or other special relationship between the parties gives rise to a duty to disclose; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth.

*Id.* Whether a duty to speak exists is a question of law. *Holland*, 338 S.W.3d at 597; *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex. App.—San Antonio 1993, writ denied). State-law fraud claims are subject to the heightened pleading requirements of Rule 9(b). *Dorsey*, 540 F.3d at 339. "Although the PSLRA's stricter scienter requirement does not apply to state-law fraud claims, Rule 9(b) nevertheless incorporates an element of scienter." *Flaherty & Crumrine Preferred Income Fund, Inc.*, 565 F.3d at 213 (quoting *Dorsey*, 540 F.3d at 341).

The parties' contentions regarding Town North's fraud claim are similar to those asserted with respect to Town North's federal securities claim. For the reasons already discussed, the court concludes that Defendants had no duty, fiduciary or otherwise, to disclose information that, according to Town North, would have made the statements in the offering documents not misleading at the time the securities were purchased. Accordingly, Town North's fraud claim based on omissions fails as a matter of law. The only other representation allegedly made before Town North purchased the securities in this case pertains to Shay's alleged pre-sale misrepresentation regarding RAST-2006-A16. Town North's fraud claim based on this statement fails for the same reasons its Rule 10b-5 based on this statement fails because Town North's pleadings with respect to this alleged

misrepresentation do not satisfy Rule 9(b).  Accordingly, Defendants are entitled to dismissal of Town North's common-law fraud claim.

## VI.     Texas Securities Act–Aider and Abetter Liability (All Defendants)

The Texas Securities Act ("TSA") imposes liability on those who sell securities:

> "by means of an untrue statement of a material fact or an omission to state a material fact," and imposes liability on a person who "materially aids a seller, buyer, or issuer of a security" if the person acts "with intent to deceive or defraud or with reckless disregard for the truth or the law."

*Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 837 (Tex. 2005) (quoting Tex. Rev. Civ. Stat. Ann. art. 581-33F(2) (Vernon Supp. 2004-2005)).  The TSA "establishes both primary and secondary liability for securities violations."  *Sterling Trust Co.*, 168 S.W.3d at 837.  Primary liability arises when "a person 'offers or sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.'"  *Id.* at 839 (quoting art. 581-33F(2)).  "Secondary liability is derivative liability for another person's securities violation."  Secondary liability:

> "can attach to . . . an aider, defined as "one who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." . . . [A]iders are jointly and severally liable with the primary violator "to the same extent as if they were" the primary violator.

*Sterling Trust Co.*, 168 S.W.3d at 839 (quoting art. 581-33F(2)) (internal citations omitted).  A plaintiff asserting a claim under the TSA for aiding and abetting liability must allege:

> 1) that a primary violation of the securities laws occurred; 2) that the alleged aider had general awareness of its role in this violation; 3) that the actor rendered substantial assistance in this violation; and 4) that the alleged aider either a) intended to deceive plaintiff or [b]) acted with reckless disregard for the truth of the representations made by the primary violator.

**Memorandum Opinion and Order - Page 51**

*Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.—Houston[14th Dist.] 2000, pet.

denied) (internal quotation marks omitted).

> [T]he TSA's requirement of "reckless disregard for the truth or the law" means that
> an alleged aider is subject to liability only if it rendered assistance to the seller in the
> face of a perceived risk that its assistance would facilitate untruthful or illegal activity
> by the primary violator. This standard does not mean that the aider must know of the
> exact misrepresentations or omissions made by the [primary violator], but it does
> mean that the aider must be subjectively aware of the primary violator's improper
> activity.

*Sterling Trust Co.*, 168 S.W.3d at 837.  The TSA's "use of the phrase 'reckless disregard for the

truth or the law' accords with the requirement that an aider must be aware of the primary violator's

improper activities before it may be held liable for assisting in the securities violation." *Id*. at 841.

The TSA's " scienter requirement of 'reckless disregard for the truth or the law' is similarly intended

to impose a requirement of 'recklessness in its subjective form,' and this recklessness must be

directly related to the primary violator's securities violation." *Id.* at 842.  Under the TSA's reckless

disregard for the truth or the law standard, "an alleged aider can only be held liable if it rendered

assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal

activity by the primary violator." *Id.*  "[T]o perceive such a risk, the alleged aider must possess a

general awareness that his role was part of an overall activity that is improper." *Id.* (citation and

internal quotation marks omitted).  State law securities claims are subject to Rule 9(b)'s pleading

requirements. *Dorsey*, 540 F.3d at 339.

    Defendants contend that Town North's aiding and abetting claim under the TSA fails because

Town North has not adequately alleged any primary securities violation or facts regarding the

additional elements, such as substantial assistance and intent to deceive, necessary to support a claim

for aiding and abetting.   Defendants contend that the Amended Complaint simply recites the elements of an aiding and abetting claim and declares them to be satisfied without elaboration.[11]

Town North disagrees and responds that it has pleaded sufficient facts regarding a primary violation by Defendants under the TSA and standard set forth in *Sterling Trust Company*.   Town North asserts that, in paragraphs 107, 126, 147, 171, and 191 of the Amended Complaint, it alleges that each Defendant "directly or indirectly, with the intent to deceive or defraud or with reckless disregard for the truth or the law, materially aided the issuers, including its affiliates, of the securities it sold to Plaintiff." Pl.'s Resp. 32.  Town North contends that, in paragraphs 57, 111, 113, 115, 136, 151, 153-55, 161, and 180 of its Amended Complaint, it also "identifies each Defendant . . . as the broker/seller of the securities involved in this case and alleges material aid in committing a primary violation."  *Id.* at 32-33.

In addition, Town North contends that it has alleged that each Defendant was aware of a primary violator's improper activities, and that each Defendant aided the sellers of the securities sold to it.  Town North contends that because the FRB Study describes the vertically integrated system of each Bank Defendant in structuring, underwriting, and trading of securities at a single desk within the Bank Defendants' offices, they cannot honestly argue that they were not aware that the offering documents contained misleading or inaccurate information. Town North contends that these allegations, at a minimum, support a finding that the Bank Defendants were reckless in their disregard for the truth or law.  Town North asserts that it has alleged and believes that discovery will establish that Defendants are the primary violators that acted as the "principal" in most, if not all,

---

[11] Shay only moved to dismiss Plaintiff's TSA claim under applicable statute of limitations and the statute of repose; however, because Shay joined in the Bank Defendants' motion to dismiss, the court considers whether Town North has failed to adequately plead a claim under the TSA for aiding and abetting as to any Defendant.

of the RMBS sales.  Alternatively, Town North contends that "if . . . Defendant[s'] affiliates, as issuers or underwriters, were the primary violators, the evidence will show, as [it] has alleged in the [Amended] Complaint, that each [D]efendant . . . materially aided the i[s]suers, including its affiliates, of the securities" that it purchased from Defendants.  *Id.* at 34.  Town North contends that because Defendants materially aided the issuers and underwriters of the securities and was aware of omissions of material information, they are jointly and severally liable with the issuers.

The Amended Complaint only asserts a claim against Defendants for aiding and abetting. The court therefore does not consider Town North's contention that its pleadings encompass a TSA claim against Defendants as the primary violator and Defendants' unidentified agents as the aiders. According to the Amended Complaint, Defendants aided the issuers of the securities purchased by Town North by failing to disclose material nonpublic information that was necessary to make the statements in the offering documents, at the time of sale, not misleading.  Pl.'s Am. Compl. ¶¶ 203-06.  After carefully reviewing the allegations in the Amended Complaint, the court agrees with Defendants that Town North has failed to allege sufficient facts regarding a primary securities violation.

The Amended Complaint alleges that the offering documents prepared by Defendants' affiliates, as issuers or underwriters of the offering documents, contained false or inaccurate statements regarding the riskiness of the securities purchased by Town North because the asset credit ratings and correlation assumptions previously used to structure and rate RMBS and CDOs, before the housing and market collapse, "were no longer accurate or reliable," and that after the record level of subprime mortgage defaults and the nationwide decline in housing prices, Defendants' affiliates knew or should have understood that the continued use of "boom-time assumptions concerning

**Memorandum Opinion and Order - Page 54**

housing price appreciation, rates of mortgage default, and mortgage loss upon default" to rate the securities inaccurately represented the securities' risk. *Id.* ¶¶ 32-33. The Amended Complaint, however, fails to specifically identify, by name, any of the Bank Defendants' affiliates or the issuers that are alleged to be the primary securities violators. The Amended Complaint also fails to identify which statements in the offering documents were false or inaccurate at the time the offering documents were issued.

Additionally, Town North alleges that the correlation assumptions, previously used to structure and rate RMBS and CDOs, only became inaccurate and unreliable *after* the housing and market collapse. Town North does not specifically state at what point in time this occurred, but it alleges that the "serial losses" it sustained occurred after December 21, 2007. Pl.'s Am. Compl. ¶13. Town North's pleadings and the offering documents attached to the motions to dismiss, however, indicate that the offering documents or prospectuses for the securities purchased by Town North were prepared between March 2002 and July 2007, and Town North does not explain why the issuers of the offering documents should have known that the asset credit ratings and correlation assumptions used to prepare offering documents before December 21, 2007, or prior to the housing and market collapse, were no longer accurate or reliable.

Further, Town North's allegations, based on the studies referred to in the Amended Complaint, that RMBS and "many 2006-2007 CDOs had known and undisclosed features of failure" is not sufficiently connected to the alleged conduct of Defendants or Defendants' affiliates with respect to the specific securities purchased by Town North. As a result, the court cannot "infer more than the mere possibility of misconduct" by Defendants' affiliates. *See Iqbal*, 129 S. Ct. at 1940.

**Memorandum Opinion and Order - Page 55**

Town North's pleadings with respect to its TSA claim against Defendants for aiding and abetting therefore fail to satisfy Rules 8(a)(2), 9(b) and Rule 12(b)(6).[12]

## VII.   Amendment of Pleadings

Town North requested and was granted leave to amend its pleadings after Defendants moved the first time to dismiss Town North's claims.  While the Amended Complaint is almost twice as long as the original Complaint, it does not cure the deficiencies noted in Defendants' original motions to dismiss and fails to state claims against Defendants upon which relief can be granted. Town North has not requested to further amend its pleadings; rather, it steadfastly maintains in response to the motions to dismiss that its claims, as pleaded, are sufficient.  The court therefore concludes that Town North has pleaded its "best case" and will not allow it an opportunity to further amend its pleadings.  *See Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). Moreover, allowing Town North to further amend will unnecessarily delay resolution of this action.

## VIII.   Conclusion

For the reasons herein explained, the court *sua sponte* **vacates** its Memorandum Opinion and Order of March 30, 2013 (Doc. 82) and **issues** this Memorandum Opinion and Order in its place. The court **grants** the Motion to Dismiss Plaintiff's Amended Complaint Against Defendants UBS Financial Services, Inc., Morgan Stanley & Co. LLC, Merrill Lynch & Co., Inc. Merrill Lynch, Pierce, Fenner & Smith Inc., and J.P. Morgan Securities LLC (Doc. 62); **grants** Shay Financial Services, Inc.'s Motion to Dismiss (Doc. 60); and **dismisses with prejudice** this action.  The court's determination in this regard moots the Motion for Interlocutory Appeal.  Accordingly, the court

---

[12] Having determined that Town North has failed to state claims upon which relief can be granted for the reasons discussed, the court need not address Defendants' additional grounds for dismissal.

**denies as moot** the Bank Defendants' Motion for Interlocutory Appeal Pursuant to 28 U.S.C.

1292(b) and Stay of Discovery (Doc. 87).  Judgment will issue by separate document as required by

Federal Rule of Civil Procedure 58.

      **It is so ordered** this 30th day of September, 2014.


                         Sam A. Lindsay
                         United States District Judge

# ATTACHMENT A

**Securities Purchased by Town North from Defendants**

| | Stock | Stock Type | Purchase Date | Prospectus-Placement Date | Barred by Statute of Repose | Def. | Pl.'s Am. Compl. |
|---|---|---|---|---|---|---|---|
| 1 | Residential Asset Securitization Trust 2006-A16 ("RAST 2006-A16") | RMBS | 3/13/07 | 12/27/06 | NO | Shay | ¶ 81 |
| 2* | FHAMS 2005-AA6 | RMBS | 9/00/05 | 6/23/05 | YES | Shay | ¶¶ 83 n.8, 102 |
| 3* | FHAMS 2005-AA5 | RMBS | 8/00/05 | 5/23/05 | YES | Shay | ¶¶ 83 n.8, 102 |
| 4* | FHAMS 2005-AA4 | RMBS | 8/00/05 | 4/22/05 | YES | Shay | ¶¶ 83 n.8, 102 |
| 5* | CWALT 2005-63 | RMBS | 12/00/05 | 10/25/05 | YES | Shay | ¶¶ 83 n.8, 102 |
| 6 | Aegis Asset Backed Securities Trust Series ("AABST 2004-1") | RMBS | 3/30/07 | 1/15/04 | YES | Shay | ¶ 87 |
| 7 | Alternative Loan Trust 2006-9 ("BOAA 2006-9") | RMBS | 7/13/07 | 12/27/06 | YES | Shay | ¶ 88 |
| 8 | Mortgage Loan Trust 2006-AR9 ("INDX 2006-AR9") | RMBS | 10/16/07 | 4/27/06 | YES | Shay | ¶ 89(a) |
| 9 | CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-3 ("CSMC 2007-3") | RMBS | 10/16/07 | 3/30/07 | NO | Shay | ¶ 89(b) |
| 10 | Banc of America Funding 2007-3 Trust ("BAFC 2007-3"), | RMBS | 10/16/07 | 4/30/07 | NO | Shay | ¶ 89(c) |

---

[*] For securities designated with asterisk (*), Plaintiff alleges that, as a result of Shay's misrepresentations and omissions in 2007 and 2008, it continued to hold on to these stocks, which it previously purchased from Shay. Because these alleged misrepresentations or omissions by Shay occurred well *after* Plaintiff purchased the stocks, Plaintiff's federal securities claim as to these securities does not involve the purchase or sale of a security and cannot support a federal securities claim.

**Attachment A Page - 1**

| 11 | Structured Asset Securities Corporation, Series 2002-5a ("SASC 2002-5A") | RMBS | 10/30/07 | 3/26/02 | YES | Shay | ¶ 90(a) |
| 12 | INDX Mortgage Loan Trust 2005-AR5 ("INDX 2005-AR5") | RMBS | 10/30/07 | 3/28/05 | YES | Shay | ¶ 90(b) |
| 13 | INDX Mortgage Loan Trust 2006-AR19 ("INDX 2006-AR19") | RMBS | 10/30/07 | 6/29/06 | YES | Shay | ¶ 90(c) |
| 14 | Greenpoint Mortgage Funding Trust, Series 2007-AR1 ("GPMF 2007-AR1") | RMBS | 10/30/07 | 2/27/07 | NO | Shay | ¶ 90(d) |
| 15 | CSFB Mortgage-Backed Trust Series 2005-11 ("CSFB 2005-11") | RMBS | 10/30/07 | 11/28/05 | YES | Shay | ¶ 90(e) |
| 16 | CWALT Alternative Loan Trust 2005-57CB ("CWALT 2005-57CB") | RMBS | 10/30/07 | 10/28/05 | YES | Shay | ¶ 90(f) |
| 17 | Washington Mutual Mortgage Pass-Through Certificates, Series 2007-2 ("WMALT 2007-2") | RMBS | 10/31/07 | 3/27/07 | NO | Shay | ¶ 91 |
| 18* | Banc of America Funding Trust 2007-5 ("BAFC 2007-5") | RMBS | 11/5/07 | 6/29/07 | NO | Shay | ¶ 92 |
| 19* | SARM 2004-20 | RMBS | before 2007 | 12/28/04 | YES | Shay | ¶ 102 |
| 20* | CMLTI 2004-HYB3 | RMBS | before 2007 | 8/25/04 | YES | Shay | ¶ 102 |
| 21* | CWALT 2005-14 | RMBS | before 2007 | 3/28/05 | YES | Shay | ¶¶ 102, 105 |
| 22* | BAFC 2006-A | RMBS | before 2007 | 1/27/06 | YES | Shay | ¶ 102 |
| 23 | MSM 2004-7AR | RMBS | before 2007 | 8/25/04 | YES | Shay | ¶ 102 |
| 24 | INDX 2005-AR1 | RMBS | before 2007 | 7/27/05 | YES | Shay | ¶ 102 |
| 25 | Soloso CDO 2007-1 Ltd. | CDO | 6/27/07 | 1/31/07 6/27/07 | NO | Bear Sterns | ¶ 111 |
| 26 | PARCS Master Trust, Class 2007-3 CALVADOS (Floating Recovery) Units | CDO | 1/31/07 | 1/31/07 | NO | Merrill Lynch | ¶ 130 |

**Attachment A Page - 2**

| 27 | Nomura Asset Acceptance Corp., Alternative Loan Trust, Mortgage Pass-Through Certificates Series 2004-APD | RMBS | 5/30/07 | 2/24/04 11/23/04 | YES | Merrill Lynch | ¶ 134 |
|----|-----------------------------------------------------------------------------------------------------------|------|---------|------------------|-----|---------------|-------|
| 28 | U.S. Capital Funding VI Ltd. | CDO | 7/2/07 | 6/28/07 | NO | Merrill Lynch | ¶ 135 |
| 29 | Morgan Stanley Mortgage Loan Trust 2005-7 | RMBS | 8/28/06 | 7/27/05 10/17/05 | YES | Morgan Stanley | ¶ 151 |
| 30 | Morgan Stanley ACES SPC, Series 2007-2 | CDO | 1/29/07 | 1/29/07 | NO | Morgan Stanley | ¶ 153 |
| 31 | Morgan Stanley ACES SPC, Series 2007-8 | CDO | 3/14/07 | 3/14/07 | NO | Morgan Stanley | ¶ 154 |
| 32 | Morgan Stanley ACES SPC, Series 2007-13 | CDO | 4/11/07 | 4/11/07 | NO | Morgan Stanley | ¶ 155 |
| 33 | MASTR Adjustable Rate Mortgages Trust 2005-2 | RMBS | 5/30/07 | 2/21/05 2/22/05 | YES | Morgan Stanley | ¶ 159 |
| 34 | Bear Stearns ALT-A Trust 2006-6 | RMBS | 8/10/07 | 8/31/06 9/29/06 | YES | Morgan Stanley | ¶ 160 |
| 35 | Merrill Lynch Mortgage Investors Trust, Mortgage Loan Asset-Backed Notes, Series 2005-A9 | RMBS | 2/28/07 | 8/26/05 12/20/05 | YES | UBS | ¶ 175 |
| 36 | REVE SPC, ING Managed Synthetic 2007-2 Class A Notes, Series 53 | CDO | 7/30/07 | 3/20/07 7/26/07 | NO | UBS | ¶ 176 |
| 37 | CSFB Mortgage-Backed Pass-Through Certificates, Series 2005-6 | RMBS | 8/30/07 | 1/25/05 6/28/05 | YES | UBS | ¶ 180 |